IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

UNITED STATES OF AMERICA,  §
                           §
v.                         §       CRIMINAL NO. H-03-0230-02
                           §
FRANK NWABARDI,            §       (Civil Action No. H-06-3701)
                           §

## MEMORANDUM AND ORDER

The defendant, Frank Nwabardi, has filed a motion to vacate, set aside, or correct sentence under 28 U.S.C. § 2255 and a supporting brief. (Docs. # 508, # 509). The government has filed a response, to which Nwabardi has submitted a reply. (Docs. # 512, # 515). At the Court's request, Nwabardi has supplemented the record with additional materials pursuant to Rule 7 of the Rules Governing Section 2255 Proceedings in the United States District Courts. (Doc. # 517). The Court has carefully reviewed all pertinent matters in this criminal case. Based on this review, the Court's clear recollection of the relevant proceedings, and the application of governing legal authorities, the Court **denies** the defendant's motion and **dismisses** the corresponding civil action (H-06-3701) for the reasons set forth below.

## I.    BACKGROUND AND PROCEDURAL HISTORY

Nwabardi owned and operated a business that performed title transfers, among other services, for motor vehicles. In 2003, a grand jury in this district returned a multi-count indictment, accusing Nwabardi and others in connection with a conspiracy to transport stolen

motor vehicles in interstate commerce in violation of 18 U.S.C. § 371.  Nwabardi was accused of illegally providing fraudulent titles or vehicle identification certificates in connection with some of the stolen motor vehicles transported as part of the conspiracy.  In addition to his role in the conspiracy (count one), Nwabardi was accused of aiding and abetting the unlawful interstate transport of two specific stolen vehicles, namely, a 2000 Ford Excursion (count two) and a 2001 Lincoln Navigator (count five), by obtaining or causing another to obtain fraudulent title documentation in violation of 18 U.S.C. §§ 2 and 2312. (Doc. # 158, *Superseding Indictment*).  Following a twelve-day trial, a jury found Nwabardi and four other co-defendants guilty as charged.  (Doc. # 256, *Verdict*).  Thereafter, the Court sentenced Nwabardi to serve a total of 42 months in federal prison, followed by a 3-year term of supervised release. (Doc. # 471, *Judgment*).

Nwabardi's conviction was affirmed on direct appeal, as were the judgments against three of his four co-defendants.  *See United States v. Nwabardi*, No. 05-20179 (5th Cir. Nov. 21, 2005); *United States v. Mendoza-Alarcon*, No. 04-20506 (5th Cir. July 21, 2005). During his direct appeal, Nwabardi argued that the evidence was insufficient to support his conviction.  The United States Court of Appeals for the Fifth Circuit summarized the evidence presented at trial, and Nwabardi's role in the offense, as follows:

> The criminal scheme involved a large and complex auto-theft ring. Some of the participants stole cars from Texas, California, and Arkansas and altered the identification information on the vehicles in order to obtain counterfeit out-of-state titles.  Once they obtained counterfeit titles for the stolen out-of-state vehicles, other members of the conspiracy would enlist the services of local businesses to register the vehicles in Texas. One of the Texas businesses used was New Millennium Title Transfer Service, which Nwabardi

2

owned and operated.  Specifically, Nwabardi's business completed auto title applications for individuals seeking to transfer their titles or obtain certified copies of their titles. Absent clean Texas titles, the ultimate objective of the conspiracy to sell the stolen vehicles at a profit would have been considerably undermined.

Ordinarily, when a person seeks a title and registration for an out-of-state vehicle in Texas, the individual must present the out-of-state title along with a vehicle identification certificate, proof of insurance, and a completed title application to the county tax assessor.  The tax office then examines the documents and forwards them to an office in Austin, which issues a new Texas title to the individual.

In order to understand Nwabardi's precise role in the conspiracy, it is necessary to examine how an individual obtains a vehicle identification certificate.  A safety inspection station issues a vehicle identification certificate, which identifies the vehicle by its Vehicle Identification Number ("VIN"). Unless the inspector falsifies the information on the inspection documents, the vehicle must be physically present at the inspection.  An additional form called a VI-30-A must be completed for out-of-state vehicles, which calls for the inspector to identify the VIN of the vehicle.  The inspector is required to sign the form, swearing that he has personally witnessed the VIN.   The certificate is then relied upon by the Texas Department of Transportation in issuing a fresh title.

At trial, the government introduced evidence that [Olufemi] Ajai assisted Nwabardi by providing vehicle identification certificates based only on the out-of-state titles.   Ajai owned an auto shop named Uni-Tech Automotive, which conducted safety inspections and issued vehicle identification certificates. According to the government's theory, Nwabardi was aware that Ajai was conducting the safety inspections without requiring the presence of the vehicles.[1] Nwabardi would then complete the title application, assemble and send away the package of relevant documents to the

---

[1]    Nwabardi testified at trial that he never personally visited Ajai to pick up the VI-30-A forms for the out-of-state vehicles that he was completing the title applications for. The title history packets on file with the Texas Department of Transportation for all three vehicles connected to Nwabardi in the indictment indicate that a California title was used to obtain the Texas title. Without explaining this apparent discrepancy, Nwabardi flatly denied that he needed the out-of-state forms to process the title application.

county tax assessor, and await the issuance of fresh title from Austin.
Although the government presented no direct evidence of Nwabardi's
voluntary involvement in the criminal enterprise, the government bolstered
the circumstantial evidence of such irregular practices with live testimony from
other members of the conspiracy explaining Nwabardi's active role in the
conspiracy.

*United States v. Nwabardi*, No. 05-20179, slip op. 2-5 (5th Cir. Nov. 21, 2005) (footnote in

original).   In addressing Nwabardi's challenge to the sufficiency of the evidence of his

involvement in the conspiracy, the Fifth Circuit observed that the testimony of two witnesses

in particular, Juan Beltran and Olufemi Ajai, was "central to the government's case against

Nwabardi, as both men explained their specific dealings with Nwabardi and how his efforts

furthered the unlawful goals of the conspiracy."   *Id*., slip op. at 8-9.   The Fifth Circuit

summarized the key testimony given by Beltran and Ajai with respect to Nwabardi's

involvement as follows:

> Ajai testified that on previous occasions unrelated to the conspiracy, Nwabardi
> would present an actual vehicle to Ajai for inspection to procure the vehicle
> identification certificate for a standard fee.   With respect to the vehicles listed
> in the indictment, however, Nwabardi simply brought Ajai the California titles
> and requested that he issue the vehicle identifications certificates without
> physical inspection.   Ajai also testified that Nwabardi paid him additional
> compensation above the normal fee for these inspection services when no
> vehicle was present.   Consistent with Ajai's account, Beltran testified that he
> brought only the California titles — never the vehicles themselves — to
> Nwabardi's business.

*Id*., slip op. at 9.   Based on this evidence, the Fifth Circuit concluded that the testimony of

Beltran and Ajai corroborated Nwabardi's complicity with the criminal scheme:

> In particular, the conspicuous changes in Nwabardi's course of dealing with
> Ajai — *i.e.* the failure to present an actual vehicle and additional compensation
> for the inspection services on these occasions — lend credence to the jury's

4

> finding on the evidence presented at trial.  At the very least, we find such
> circumstantial evidence more than sufficient to support an inference that
> Nwabardi was guilty of the [conspiracy to transport stolen vehicles in
> interstate commerce in violation of 18 U.S.C. § 371].

*Id.* at 10.  The Fifth Circuit concluded further that the evidence of his "altered business practices with respect to the stolen vehicles" was sufficient to support his conviction on the aiding and abetting counts with regard to the 2000 Ford Excursion and the 2001 Lincoln Navigator. *Id*. at 11-12.

Nwabardi, who is represented by counsel on collateral review, now argues that he is entitled to relief from his conviction and sentence under 28 U.S.C. § 2255, because he was denied effective assistance of counsel at his trial.  The government argues that Nwabardi is not entitled to relief.  Nwabardi has filed a reply and he has supplemented the record with additional documentation in the form of affidavits.  After reviewing the entire record, the Court concludes that the defendant is not entitled to relief under § 2255 for reasons discussed briefly below.

## II.  <u>STANDARD OF REVIEW FOR SECTION 2255 MOTIONS</u>

To obtain collateral relief pursuant to 28 U.S.C. § 2255, a petitioner "must clear a significantly higher hurdle" than the standard that would exist on direct appeal.  *United States v. Frady*, 456 U.S. 152, 166 (1982).  When a defendant has been convicted and his conviction has been upheld on direct appeal, there is a presumption that the defendant's conviction is fair and final.  *United States v. Cervantes*, 132 F.3d 1106, 1109 (5th Cir. 1998).  "As a result, review of convictions under section 2255 ordinarily is limited to questions of

constitutional or jurisdictional magnitude, which may not be raised for the first time on collateral review without a showing of cause and prejudice." *Id.* Of course, this procedural bar does not apply to claims that could not have been raised on direct appeal, such as those for ineffective assistance of counsel. *See Massaro v. United States*, 538 U.S. 500 (2003) (holding that ineffective-assistance claims are properly raised on collateral review and not procedurally barred by a failure to raise them on direct appeal).

## III.   DISCUSSION

Nwabardi complains that he is entitled to relief from his conviction because his defense attorney was ineffective at trial.   The Sixth Amendment guarantees criminal defendants the effective assistance of counsel. *See Yarborough v. Gentry*, 540 U.S. 1, 5 (2003).   Claims for ineffective assistance of counsel are analyzed under the well-settled standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).   To prevail under the *Strickland* standard, a defendant must demonstrate both constitutionally-deficient performance by counsel and actual prejudice as a result of the alleged deficiency. *See Williams v. Taylor*, 529 U.S. 390, 390-91 (2000).   "Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that rendered the result unreliable." *Strickland*, 466 U.S. at 687.

Counsel's performance is constitutionally deficient if it falls below an objective standard of reasonableness. *See United States v. Molina-Uribe*, 429 F.3d 514, 518 (5th Cir. 2005) (citing *Strickland*, 466 U.S. at 687-88), *cert. denied*, — U.S. —, 126 S. Ct. 1616 (2006).   Scrutiny of counsel's performance must be "highly deferential," and a reviewing

court must make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Molina-Uribe*, 429 F.3d at 518 (quoting *Strickland*, 466 U.S. at 689). There is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* To prove prejudice, a defendant must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *United States v. Harris*, 408 F.3d 186, 189 (5th Cir.) (quoting *Strickland*, 466 U.S. at 694), *cert. denied*, — U.S. —, 126 S. Ct. 297 (2005).

In this instance, Nwabardi was represented by local criminal defense attorney Edmond N. O'Suji at his trial. The motion and supporting memorandum present four allegations of deficiency concerning O'Suji's performance:[2]  (1) that O'Suji failed to object when Nwabardi was "not allowed" to be present during jury selection; (2) that O'Suji failed to object to the government's use of "uncharged conduct" in front of the jury; (3) that O'Suji failed to "present and develop mitigating evidence" by calling Angela Obasi and a

---

[2]  Nwabardi has filed a "Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody," which raises five overlapping claims for ineffective assistance of counsel as grounds for relief. (Doc. # 508). Nwabardi has also filed a "Brief in Support of Motion Under 28 U.S.C. § 2255 to Vacate Sentence By Person in Federal Custody," which addresses only two of the claims raised in Nwabardi's motion, namely, that trial counsel failed to "present and develop mitigating evidence" by calling certain witnesses and that trial counsel failed to "impeach the government's witnesses" or to "rebut cumulatively prejudicial evidence." (Doc. # 509). The government's response addresses only the claims raised in Nwabardi's brief. (Doc. # 512).

representative from the Texas Department of Transportation as witnesses on his behalf; and (4) that O'Suji failed to adequately impeach or properly cross-examine three government witnesses. Each of the alleged deficiencies is addressed separately below.

### A.    Failure to Object During Jury Selection

Nwabardi claims that he was "not allowed to be present" during his jury selection and that O'Suji was deficient for failing to object. The record reflects that Nwabardi was present during voir dire, and that he introduced himself to the panel of prospective jurors. (Hearing Minutes [Doc. # 227]; Trial Transcript [Doc. # 397], vol. 1, at 40). Nwabardi provides no facts in support of his claim and there is no indication in the record that he was intentionally excluded from any portion of the proceeding or that O'Suji had a meritorious objection to make.[3]

"Failure to raise meritless objections is not ineffective lawyering; it is the very opposite." *Clark v. Collins*, 19 F.3d 959, 966 (5th Cir.), *cert. denied*, 513 U.S. 955 (1994). Absent a showing that counsel failed to raise a meritorious objection and that the outcome would have been different, the defendant fails to demonstrate deficient performance or actual

---

[3]    The Sixth Amendment establishes a criminal defendant's right to be present at trial and "to be confronted with the witnesses against him . . . ." U.S. CONST. amend. VI; *Illinois v. Allen*, 397 U.S. 337, 338 (1970). This right to be present is not absolute, however, and can be waived by the voluntary absence of the defendant. *See Taylor v. United States*, 414 U.S. 17, 19-20 (1973) (per curiam); *Clark v. Scott*, 70 F.3d 386, 388 (5th Cir. 1995); *see also* Fed. R. Crim. P. 43(c)(1)(A) (A defendant may "waive the right to be present . . . when the defendant is voluntarily absent after the trial has begun, regardless of whether the court informed the defendant of an obligation to remain during trial"). Assuming that Nwabardi was absent for a portion of the jury selection, and he provides no facts in support of this assertion, his voluntary absence constitutes a waiver of the right to be present. Moreover, Nwabardi alleges no facts showing that he was harmed in any way by his absence.

prejudice.  *See Parr v. Quarterman*, 472 F.3d 245, 256 (5th Cir. 2006) (holding that counsel was not deficient in failing to present a meritless argument) (citation omitted);  *Smith v. Puckett*, 907 F.2d 581, 585 n.6 (5th Cir. 1990) ("Counsel is not deficient for, and prejudice does not issue from, failure to raise a legally meritless claim."); *Lavernia v. Lynaugh*, 845 F.2d 493, 499 (5th Cir. 1988) ("Counsel cannot be faulted for failing to pursue meritless motions.") (citations omitted); *Murray v. Maggio*, 736 F.2d 279, 283 (5th Cir. 1984) ("Counsel is not required to engage in the filing of futile motions.").

Because he has not alleged or shown that O'Suji had a valid objection to raise regarding Nwabardi's alleged absence during jury selection, Nwabardi fails to demonstrate that his counsel's performance was deficient or that he was prejudiced as a result. Accordingly, Nwabardi fails to establish a claim for ineffective assistance of counsel on this issue.

**B.      Failure to Object to "Uncharged Conduct"**

Nwabardi also contends that O'Suji was deficient for failing to object to the government's use of "uncharged conduct" in front of the jury.  Specifically, Nwabardi claims that the government "informed the jury that [his] name appeared on a 'title transfer form,' when in fact it was only a duplicate title form."  Nwabardi, who is represented by counsel, does not brief this issue or demonstrate how he is entitled to relief.  His conclusory allegation of ineffective assistance is insufficient to establish a valid claim.  *See, e.g.*, *Collier v. Cockrell*, 300 F.3d 577, 587 (5th Cir. 2002) ("This Court has made clear that conclusory allegations of ineffective assistance of counsel do not raise a constitutional issue in a federal

habeas proceeding.") (citation omitted), *cert. denied*, 537 U.S. 1084 (2002); *Green v. Johnson*, 160 F.3d 1029, 1042 (5th Cir. 1998) ("Mere conclusory allegations in support of a claim of ineffective assistance of counsel are insufficient to raise a constitutional issue."); *Koch v. Puckett*, 907 F.2d 524, 530 (5th Cir. 1990) (holding that the petitioner's conclusory allegations failed to establish a valid ineffective assistance of counsel claim).

Moreover, Nwabardi fails to show that the above-referenced statement constitutes evidence of an uncharged criminal offense that was intentionally, rather than mistakenly, presented by the government.  Even assuming that O'Suji was deficient for failing to object or to clarify the comment at issue, Nwabardi fails to show that he suffered any actual prejudice as a result.  Therefore, Nwabardi fails to demonstrate that he is entitled to relief in connection with his counsel's failure to correct alleged misstatement.

### C.   Failure to "Present and Develop Mitigating Evidence"

Nwabardi contends that O'Suji was deficient because he did not call Angela Obasi or a representative from the Texas Department of Transportation as witnesses on his behalf. Nwabardi insists that he sought only to obtain "copies of or duplicate Texas titles for the vehicles identified in the indictment" and that he did nothing unlawful. (Memorandum [Doc. # 509], at 14).  According to Nwabardi, the uncalled witnesses would have provided information regarding the "process for obtaining duplicate title and whether or not the allegations against [Nwabardi] were substantiated."  By neglecting to call these witnesses, Nwabardi contends that O'Suji failed to "present and develop mitigating evidence" at trial.

10

The Fifth Circuit has decided that "[c]omplaints of uncalled witnesses are not favored in federal habeas corpus review because allegations of what a witness would have testified are largely speculative." *Sayre v. Anderson*, 238 F.3d 631, 635-36 (5th Cir. 2001) (quoting *Lockhart v. McCotter*, 782 F.2d 1275, 1282 (5th Cir.1986)).  Where the only evidence of a missing witnesses' testimony is from the defendant, claims of ineffective assistance are viewed "with great caution."  *Id.* at 636 (citing *Lockhart*, 782 F.2d at 1282; *Marler v. Blackburn*, 777 F.2d 1007, 1010 (5th Cir. 1985); *Murray v. Maggio*, 736 F.2d 279, 282 (5th Cir.1984); *United States v. Cockrell*, 720 F.2d 1423, 1427 (5th Cir. 1983); *Buckelew v. United States*, 575 F.2d 515, 521 (5th Cir.1978)); *see also Evans v. Cockrell*, 285 F.3d 370, 377 (5th Cir. 2002) (explaining that a movant "must show not only that [the] testimony would have been favorable, but also that the witness would have testified at trial").  To demonstrate the required *Strickland* prejudice on a claim of ineffective assistance in this context, a defendant "must show not only that [the] testimony would have been favorable, but also that the witness would have testified at trial."  *Evans v. Cockrell*, 285 F.3d 370, 377 (5th Cir. 2002).

According to information provided by Nwabardi's counsel on collateral review, Ms. Obasi was listed as a witness for the defense but she was not called to testify at trial. (Affidavit of Eric J. Davis [Doc. # 517], Ex. 1; *id.*, Defendant Frank Nwabardi Witness List, Ex 1(b)).  Ms. Obasi's testimony would have been useful, according to Nwabardi, because of her "extensive experience in the title business[.]" (Supplemental Reply [Doc. # 517], at 3).  If called as a witness, Ms. Obasi reportedly would have testified as follows:

11

I am a licensed title service agent in Harris County Texas and I live and work in Houston, TX.  I own and operate a licensed title service company named ATLoyds Auto Title Annex operating in Harris County TX.  In 2005, I owned and operated this business.

I have been operating an auto title company since 1994.  Among other services, I provide single-owner and dealer title transfer services.  I also provide title transfer and vehicle registration services for vehicle owners with out-of-state vehicle titles seeking Texas vehicle title registration.  Based on over ten years [of] experience, I have intricate knowledge of title transfer practices in Harris County, Texas.

When seeking duplicate title documents, title agents are only required to present a signed Form I-34 Duplicate Title Application by owner or lien holder, a copy of his or her driver's license, a copy of the vehicle owner's driver's license or if there is a lien holder, a signed lien release and a copy of a driver's license, a copy of his business card, the letter on the agent's letterhead and the application fee.  If the title agent personally brings the application and materials to the Texas Department of Transportation's local office and the application is accepted, the agent may be given the title documents at that time.

When seeking original title, the owner or purchaser need only present the agent with the vehicle title document, a completed Form 130-U endorsed by the all [sic] previous owners, the purchaser and the seller to have that vehicle title registered in Texas.  They must present a copy of their driver's license, copy of social security card and proof of insurance on any vehicle with exception of salvage vehicles.  If however the seller gives the purchaser a bill of sale, the seller's signature is not required on the Form 130-U.

Anyone may present title documents to the title agent for title transfer.  That person does not have to be the purchaser or seller.

Before April 2005, agents were not required to have copies of the driver's licenses of the purchasers or the client obtaining vehicle title documents on file.

(Affidavit of Eric J. Davis [Doc. # 517], Ex. 1 (summarizing Ms. Obasi's proposed testimony)).[4] Nwabardi insists Ms. Obasi "would have qualified as an expert in her field," that her expert testimony would have been useful to his defense, and that, if called as a witness, "[h]er testimony would have made a difference in the outcome of the trial." (Supplemental Reply [Doc. # 517], at 3).

Nwabardi insists further that O'Suji should have called a representative from the Texas Department of Transportation to testify about the process for obtaining duplicate titles. According to Nwabardi's pleadings, no employee of the Texas Department of Transportation would provide him with an affidavit for purposes of this proceeding under 28 U.S.C. § 2255. (*Id.* at 4). If subpoenaed, however, Nwabardi contends that a representative would have come to court and would have offered testimony on the following two issues: (1) the requirements in the years 2001 and 2002 for the owner of a title company to obtain a certified copy of a vehicle registration or title document on a client's behalf; and (2) the requirements in the years 2001 and 2002 for the owner of a title company to obtain an original title document for a client's vehicle. The proposed testimony is summarized in an affidavit provided by Deshonda Tackett, who works as an investigator for Nwabardi's current counsel. The proposed testimony is reportedly based on Tackett's interview of unidentified "tellers and a supervisor" at the Texas Department of Transportation:

---

[4]     According to Davis's affidavit, which summarizes the testimony Ms. Obasi reportedly would have given if she had been called as a witness, Ms. Obasi was willing to testify at trial, but she not willing to sign an affidavit of her own. (Doc. # 517, Ex. 1).

[T]his is what I was told: If a person applies for a certified copy of a vehicle title and he/she is not the owner, if there is no lien holder, the person (title company representative) would need the record owner's signature, a copy of the owner's driver's license and the application fee of $5.45.  In addition, that third party would have to present their [i]dentification and/or valid driver's license to be recorded along with the application.  Upon presentation of all these things the requester would receive the certified copy of title right then and there at the [Texas Department of Transportation] office.

I was told that in terms of an original title request, the process involves waiting for the office in Austin, Texas to mail the document to the requester. When requesting an original title, the requester third-party representative from the title company, would have to have a certified copy of the title properly assigned to the purchaser of the vehicle along with the [Texas Department of Transportation] application.  The third-party representative from the title company would be allowed to present such documents to [the Texas Department of Transportation].   Then, that local [Texas Department of Transportation] office would mail the application and attached documents to the [c]ity tax assessor's office that would then mail the application to Austin for issuance of the document to be mailed to the requester.  The requester would not be able to get the original title on the spot.

(Affidavit Deshonda Hackett [Doc. # 517], Ex. 2).  Nwabardi maintains that, based on this summary, witness testimony at trial from a representative of the Texas Department of Transportation "would have supported a finding that the procedures Nwabardi used in issuing title were lawful" and that such testimony "may have resulted in a not guilty verdict." (Supplemental Reply [Doc. # 517], at 5).

It is clear from the testimony summarized above that neither of the proposed witnesses had personal knowledge of Nwabardi's business activities generally, his record keeping practices, or his involvement in obtaining copies of title certificates or new Texas titles, if any, for the vehicles in this case.  Nwabardi's ineffectiveness of counsel arguments here hinge in the proposition that counsel did not adequately develop at trial the distinction

between Nwabardi's title service role in obtaining "certified copies" of Texas vehicle titles and obtaining new Texas titles on vehicles brought in from out-of-state, and did not establish what he contends were standard recordkeeping procedures for title transfer service businesses in Harris County, Texas at relevant times.

Nwabardi's arguments fail because the information he sought to elicit from the uncalled witnesses is cumulative of testimony and evidence in the trial record. First, as to the differences in procedure for obtaining certified copies (referred to in the record sometimes as "CCOs") from the Texas Department of Motor Vehicles as compared to obtaining new Texas titles were explained by several witnesses at trial, was explained by Nwabardi when he testified in his own defense, and was evident from the numerous exhibits. As to Government witnesses, the Government called Margaret Wood, an Assistant Regional Manager for the Texas Department of Transportation, who testified at length about the procedures used to obtain motor vehicle titles and the different procedures used to obtain certified copies of Texas titles. (*Compare, e.g.,* Trial Transcript [Doc. # 399], vol. 17, at 21-24, *with id.*, vol. 17, at 24, 28). Two other key witnesses called by the Government, California Highway Patrol Officer Richard Lee Job and Houston Police Officer Tom Charles Civitello, also explained these differences. Nwabardi also testified on his own behalf about the procedures that he used to obtain titles. (Trial Transcript [Doc. # 422], vol. 25, at 40-116). Finally, the first page of each of the exhibits pertaining to the vehicles with which Nwabardi was associated (most importantly, Government Exhibits 1 and 37) reveal on their face that Nwabardi signed papers only requesting certified copies, not requesting new vehicle

15

titles.  Thus, the Court finds that Nwabardi's uncalled witnesses would have added nothing new to the trial record and the failure to call them was not deficient performance.

Further, because the additional witness testimony proposed by Nwabardi is cumulative of evidence presented by other witnesses, and not based on personal knowledge of the transactions at issue, Nwabardi fails to demonstrate that he was prejudiced by counsel's omissions.  Nwabardi has not demonstrated that the proposed testimony would have changed the trial outcome.[5]  Absent a showing that testimony from either one of the proposed witnesses would have altered the verdict, *see Harris*, 408 F.3d at 189 (quoting *Strickland*, 466 U.S. at 694), Nwabardi does not establish a valid claim for ineffective assistance of counsel for failure to call witnesses or present the above-referenced evidence.

**D.     Failure to Adequately Cross-Examine Government Witnesses**

Nwabardi contends that O'Suji was deficient for failing to adequately impeach three government witnesses through cross-examination, including Juan Beltran, Olufemi Ajai, and Louis Campbell.  Cross-examination by counsel is a matter of trial strategy.  Strategic decisions made by counsel during the course of trial are entitled to substantial deference in the hindsight of collateral review.  *See Strickland*, 466 U.S. at 689 (emphasizing that "[j]udicial scrutiny of counsel's performance must be highly deferential" and that "every

---

[5]     It is noted that testimony of cooperating co-conspirators, such as Ajai, implicated Nwabardi directly.  For instance, Ajai stated that Nwabardi specifically hired him to prepare vehicle inspection forms without seeing the cars.  The fact that the documents reveal that Nwabardi actually signed requests for copies of Texas titles does not refute the Government's argument that Nwabardi facilitated the conspiracy by engaging others to take the steps necessary to make stolen cars appear legitimately titled in Texas.

16

effort [must] be made to eliminate the distorting effects of hindsight"). A reviewing court may not find ineffective assistance of counsel merely because it disagrees with counsel's chosen trial strategy. *Crane v. Johnson*, 178 F.3d 309, 312 (5th Cir. 1999). It is well established that "[a] conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." *Green v. Johnson*, 116 F.3d 1115, 1122 (5th Cir. 1997); *Garland v. Maggio*, 717 F.2d 199, 206 (5th Cir. 1983) (citing *Fitzgerald v. Estelle*, 505 F.2d 1334 (5th Cir. 1975); *Daniels v. Maggio*, 669 F.2d 1075 (5th Cir. 1982)). As outlined below, Nwabardi does not demonstrate that his counsel's strategy was deficient or that his entire trial was rendered unfair as the result of his cross-examination of the above-referenced government witnesses.

### 1.    Juan Beltran

Nwabardi complains that O'Suji was deficient because he "all but conceded" the credibility of the government's primary witnesses against him, referencing Juan Beltran. (Memorandum [Doc. # 509], at 11). Beltran testified for the government as a cooperating witness and provided testimony about specific transactions involving Nwabardi and his role in the conspiracy. (Trial Transcript [Doc. # 415], at 197-337; Trial Transcript [Doc. # 415],, at 9-80). Beltran testified that he obtained fraudulent motor vehicle titles from Nwabardi. (Trial Transcript [Doc. # 415], at 274-83). Beltran also conceded at the outset of his direct examination, however, that he was not in the United States legally and that he was attempting to become a naturalized citizen with the government's assistance. (Trial Transcript [Doc.

17

# 415], at 198-200, 208-12).  Beltran testified further that he had a criminal record, which included other arrests for trafficking stolen motor vehicles.  (*See id*. at 200-208).

There were at least four other co-defendants on trial along with Nwabardi, and Beltran was cross-examined extensively by all defense counsel.  Beltran was cross-examined immediately by counsel for another co-defendant regarding his immigration status.  During that questioning, Beltran admitted that he was subject to deportation from the United States and that he therefore had a motive to testify favorably for the government.  (Trial Transcript [Doc. # 416], vol. 19, at 80-86).  Beltran was also questioned about his criminal record.  (*See id*. at 86).  When it was his turn to question Beltran, O'Suji focused his cross-examination on Beltran's testimony against his client. In that regard, O'Suji mainly questioned Beltran about whether he had ever informed Nwabardi that the vehicles at issue were stolen.  (*See id*, at 96-115; Trial Transcript [Doc. # 417], vol. 20, at 227-30).

Because Beltran's credibility and potential bias were aggressively challenged by trial counsel for other defendants, additional cross-examination on that issue would have been cumulative.  Nwabardi does not suggest what else O'Suji could have or should have done to question Beltran or to impugn the credibility of this witness.  Nwabardi's conclusory allegations are insufficient to establish a deficiency or actual prejudice.  Nwabardi fails to demonstrate a valid claim for ineffective assistance of counsel with respect to his cross-examination of Beltran.

## 2.    Olufemi Ajai

As with Beltran, Nwabardi complains that O'Suji was deficient because he "all but conceded" the credibility of Olufemi Ajai, who also testified as a cooperating witness for the

government. (Memorandum [Doc. # 509], at 11). Ajai, an auto technician or mechanic who performed vehicle inspections, testified that Nwabardi would request inspection certificates and identification certificates without the vehicle being present. (Trial Transcript [Doc. # 419], at 180-94). At the outset of his testimony, Ajai conceded that he had been charged as a co-defendant in the conspiracy and that he was testifying pursuant to the terms of a written plea agreement with the government in the hopes of receiving a reduced sentence. (*See id*. at 180-86).

On cross-examination, O'Suji repeatedly accused Ajai of testifying falsely so that he could satisfy the terms of his plea bargain. (*See id*. at 223-25). Nwabardi does not allege or show what else O'Suji could have or should have done to challenge Ajai's credibility as a witness. Nwabardi's conclusory allegations are insufficient to establish a deficiency or actual prejudice in that respect. Thus, Nwabardi fails to demonstrate a valid claim for ineffective assistance of counsel with respect to his cross-examination of Ajai.

### 3.     Louis Campbell

Nwabardi also faults O'Suji for failing to effectively cross-examine Louis Campbell, who testified as a rebuttal witness for the government. Campbell, who works for the National Insurance Crime Bureau ("NICB"), offered an opinion that Nwabardi had a "bad" reputation and that he was not regarded as a "law-abiding" citizen. (Trial Transcript [Doc. # 422], at 277-78).

On cross-examination, O'Suji forced Campbell to concede that he had never met Nwabardi in person. (*See id*. at 278). Nwabardi does not suggest what else O'Suji could

have done to discredit Campbell's opinion testimony.  Nwabardi fails to demonstrate that O'Suji's performance was deficient with respect to this witness or that he was actually prejudiced as a result.  Therefore, Nwabardi fails to establish a claim for ineffective assistance of counsel with respect to his cross-examination of Campbell.

## IV.   EVIDENTIARY HEARING

Nwabardi has requested an evidentiary hearing in this matter so that he can present the witness testimony, which is summarized in the affidavits from his counsel and counsel's investigator.  (Affidavits of Eric J. Davis and Tashonda Hackett [Doc. # 517], Exs. 1 and 2).  A motion brought under 28 U.S.C. § 2255 can be denied without a hearing if the motion, files, and records of the case conclusively show that the defendant is not entitled to relief.  *See United States v. Bartholomew*, 974 F.2d 39, 41 (5th Cir. 1992) (*per curiam*) (citing *United States v. Auten*, 632 F.2d 478 (5th Cir. 1980)).   The record in this case, as supplemented by the above-referenced affidavits, is adequate to dispose fairly of the allegations made by the defendant.  A district court need inquire no further on collateral review.  Therefore, Nwabardi's request for an evidentiary hearing is denied.

## V.   CERTIFICATE OF APPEALABILITY

The defendant's § 2255 motion is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, codified as amended at 28 U.S.C. § 2253.  Thus, a certificate of appealability is required before an appeal may proceed.  *See Hallmark v. Johnson*, 118 F.3d 1073, 1076 (5th Cir.) (noting that actions filed under either 28 U.S.C. § 2254 or § 2255 require a certificate of appealability), *cert. denied*

20

*sub nom. Monroe v. Johnson*, 522 U.S. 1003 (1997). "This is a jurisdictional prerequisite because the COA statute mandates that '[u]nless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals . . . .'" *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (citing 28 U.S.C. § 2253(c)(1)).

A certificate of appealability will not issue unless the petitioner makes "a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), which requires a petitioner to demonstrate "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). Under the controlling standard, this requires a petitioner to show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El*, 537 U.S. at 336. Where denial of relief is based on procedural grounds, the petitioner must show not only that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right," but also that they "would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484.

A district court may deny a certificate of appealability, *sua sponte*, without requiring further briefing or argument. *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000). After carefully considering the entire record of the criminal proceeding, the Court concludes that jurists of reason would not debate whether the movant has stated a valid claim or

whether any procedural ruling in this case was correct.   Accordingly, a certificate of appealability will not issue.

## VI.   **CONCLUSION AND ORDER**

Because the defendant has failed to establish an error of constitutional or jurisdictional magnitude, he is not entitled to relief under 28 U.S.C. § 2255.  Based on the foregoing, the Court **ORDERS** as follows:

1.   The defendant's pending § 2255 motion (Doc. # 508) is **DENIED** and the corresponding civil action (H-06-3701) is **DISMISSED** with prejudice.

2.   A certificate of appealability from this decision is **DENIED**.

The Clerk will provide a copy of this order to the parties and will file a copy of this order with the docket in Civil Action No. H-06-3701.

SIGNED at Houston, Texas, on May 9, 2007.

Nancy F. Atlas
United States District Judge